IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SOUTHWEST AIRLINES PILOTS' ASSOCIATION, | § § § | |
| Plaintiff, | § § | |
| vs. | § § | CIVIL ACTION NO. _____ |
| SOUTHWEST AIRLINES CO., | § § § | |
| Defendant | § § § | |

**PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND**

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff Southwest Airlines Pilots' Association (hereinafter "SWAPA" or "Plaintiff"), by and through its President Jon Weaks, and by and through its attorneys, Gillespie Sanford LLP, files this Original Complaint against Southwest Airlines Co. ("Southwest Airlines" or "Defendant"), seeking declaratory and injunctive relief. SWAPA would show the following:

**I. PARTIES, JURISDICTION AND VENUE**

1.  SWAPA is a not-for-profit labor organization with its principal offices located at 1450 Empire Central Drive, Suite 737, Dallas, TX 75247. SWAPA is the sole collective bargaining unit under the Railway Labor Act ("RLA"), 45 U.S.C. § 151-188, for the more than 8,000 pilots of Southwest Airlines.

2.  Southwest Airlines is a domestic for-profit corporation, organized and existing under the laws of the State of Texas and having offices and its principal place of business at 2702 Love Field Drive, Dallas, Texas 75235. Southwest Airlines is a "common carrier" by air engaged in interstate and foreign commerce under 42 U.S.C. § 1981 and is subject to the

provisions of the RLA.  Southwest Airlines does business in the state of Texas and within the Northern District of Texas.  Venue is proper in the Northern District of Texas against Southwest Airlines under 28 U.S.C. § 1391(b) because jurisdiction is not dependent on diversity of citizenship and Southwest Airlines is doing business within this district and Southwest Airlines resides in this district.  Defendant Southwest Airlines may be served via its registered agent for service, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, TX 78701-3218.

3. This Court has subject matter jurisdiction under the RLA, 45 U.S.C. §§ 151 *et seq.,* pursuant to 28 U.S.C. § 1331.  This Court also has jurisdiction herein pursuant to 28 U.S.C. § 1337, as this is an action arising under a statute that regulates commerce and/or protects trade and commerce against restraints, namely, the RLA.  Plaintiff's claims are also brought under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and seek a declaration as to the parties' rights and obligations under the RLA.  SWAPA is entitled to such a declaration because the instant dispute is an actual and existing controversy.

4. Venue exists in this district and division under 28 U.S.C. § 1391 and 38 U.S.C. § 4323(c).

## II.  NATURE OF THE ACTION

5. SWAPA brings this action against Defendant Southwest Airlines for declaratory and injunctive relief pursuant to 28 U.S.C. § 2201, the Declaratory Judgment Act, and 45 U.S.C. §§ 151-188, the Railway Labor Act.  45 U.S.C. §§ 156 and 181.

6. SWAPA and Defendant Southwest Airlines are parties to a collective bargaining agreement negotiated for the period September 1, 2006 through August 31, 2012 ("the current CBA").  Pursuant to the terms of the RLA, the current CBA has continued in effect after August

31, 2012, even as the parties (SWAPA and Southwest Airlines) have carried on negotiations to reach a new collective bargaining agreement pursuant to the RLA's Section 6 dispute resolution process. *Detroit & T.S.L.R.R. v. UTU,* 396 U.S. 142, 149-53 (1969).

7. Among other things, Section 6 of the RLA requires the parties to maintain *status quo* until a new agreement is reached, which means that rates of pay, rules and working conditions shall not be altered by the carrier until a new agreement is reached. *Id.*

8. The parties now have a "major" dispute within the meaning of the RLA and relevant case law, namely negotiations to amend the applicable collective bargain agreement ("CBA") pursuant to the RLA's dispute resolution process.  More specifically, Defendant Southwest Airlines has threatened and publicized that it will not only accept early delivery of, but also put into service, a type of aircraft that is not listed the current CBA.  These unlisted aircrafts, the Boeing 737-800 MAX (also called the MAX8) and the 737-700 (also called the MAX7), are subject to an express reopener for the parties to first negotiate "wages, rates of pay, relocation expenses, bidding, and hours or conditions of employment particularly applicable to the specific situation" under Section 1.M of the current CBA. Collectively the B737-700 MAX, also identified as the MAX7 and the B737-800 MAX, also identified as the MAX8 are referred to herein as the MAX.

### III.   FACTS

**SWAPA AND SOUTHWEST AIRLINES ARE ENGAGED IN A "MAJOR" DISPUTE**

9. The current CBA provides in Section 1.M:

> In the event that the Company, during the duration of this Agreement, should: (1) acquire for its use any type of aircraft other than the B717, B737-300, B737-500, B737-700, and the B737-800, (2) establish any new classification of employees employed within the bargaining unit and not in existence on the date of this Agreement, (3) conduct flying limited to cargo only, or (4) begin flying international routes, other than near international routes, will be reopened for the

sole purpose of negotiating wages, rates of pay, relocation expenses, bidding, and hours or conditions of employment particularly applicable to the specific situation. If the FAA, or the Company, or other competent authority restricts any current aircraft type to a subset of pilots, other than Extended-range Twin-engine Operational Performance Standards (ETOPS) flying, this paragraph shall apply.

10. The parties have consistently recognized and agreed that before Southwest Airlines may put into service any type of aircraft other than those listed in Section 1.M of the CBA, the CBA must be reopened and wages, rates of pay, relocation expenses, bidding, and hours or conditions of employment particularly applicable to any different type of aircraft must be negotiated and agreed to. Specifically:

   a. The CBA, dated September 1, 2006, required reopening as to use of any type of aircraft other than the B737-300, B737-500 and the B737-700.

   b. Side Letter 6, dated December 1, 2010, required reopening as to use of any type of aircraft other than the B737-300, B737-500, B737-700 and the B737-800. Side Letter 6 was expressly negotiated to allow Southwest Airlines to bring the B737-800 into service.

   c. Side Letter 10, dated September 22, 2011, required reopening as to use of any type of aircraft other than the B717, B737-300, B737-500, B737-700 and the B737-800. Side Letter 10 was expressly negotiated to allow Southwest Airlines to bring the B717 into service.

   d. On or about March 2012 the parties reopened as to the overall collective bargaining agreement. On November 20, 2014, the parties entered mediation with the National Mediation Board. Thereafter, when the tentative new CBA failed to win ratification in November 2015, the parties failed to renegotiate wages, rates of pay, relocation expenses, bidding, and hours or conditions of employment particularly applicable to the MAX. Specifically, the failed tentative agreement was the attempted negotiation to allow Southwest Airlines to bring the MAX7 and MAX8 into service.

11. Consistent with the parties' recognition and agreement as to the requirement to reopen and negotiate wages, rates of pay, relocation expenses, bidding, and hours or conditions of employment for unlisted aircraft, the parties did so before Southwest Airlines began using previously unlisted aircraft. For example, with respect to the B737-800, which was unlisted in Section 1.M, defendant Southwest Airlines did not put that previously unlisted aircraft into service until after the parties reached Side Letter 10 dated September 22, 2011.

12. In similar fashion, the parties have also consistently recognized and agreed the CBA must be reopened and wages, rates of pay, relocation expenses, bidding, and hours or conditions of employment particularly applicable to flying international routes. Specifically:

   a. The CBA dated September 1, 2006 required reopening as to "(4) begin flying international routes . . . ."

   b. Side Letter 12 dated June 18, 2012 changed Section 1.M to require reopening as to "(4) begin flying international routes, other than near international routes . . . ."

13. The aircraft at issue, the MAX, is a previously unlisted, distinct type of aircraft other than the B717, B737-300, B737-500, B737-700, and the B737-800. Consistent with the requirements of law and the current CBA, the parties had attempted to negotiate wages, rates of pay, relocation expenses, bidding, and hours or conditions of pay with respect of the MAX as part of the tentative agreement that failed ratification in October 2015. Following the failed negotiations, there remains no contract provision between the parties to allow Defendant Southwest Airlines to put into service the MAX.

14. In contravention of the "integrated, harmonious scheme for preserving the status quo from the beginning of the major dispute through the final 30-day cooling-off' period," Defendant Southwest Airlines has publicized its intention to put the MAX into service without

and prior to "an agreement that resolves the dispute." *Detroit & T.S.L.R.R. v. UTU,* 396 U.S. at 149, 152. In its publication to all 8,300 pilots, Defendant Southwest Airlines stated in Craig's Update, dated February 23, 2016, that "the MAX is covered by the current agreement." Southwest Airlines is presently threatening that pilots, in effect, will be forced to labor without resolution of the dispute as to the MAX.

15. The current CBA does not and cannot include the MAX, as it is a previously unlisted type of aircraft.

16. In its March 1, 2016 website, manufacturer Boeing describes the MAX as a different type of aircraft from any listed in Section 1.M of the current CBA. Boeing, under the heading "CREATING THE 737 MAX," says:

> The 737 MAX family of airplanes is designed to deliver more of everything to advance the business of our customers – and the satisfaction of their customers. There's more advanced technology from nose to tail: new engines, new winglets, new flight deck displays and the passenger –preferred Boeing Sky interior, with more seats to maximize profit potential. More profit for operators, more comfort for passengers. That's a better way to fly.

17. Southwest Airlines' own marketing pamphlet celebrates the MAX aircraft. **(Attachment A)** The publication highlights "MAX MILESTONES" for MAX8 that include:

- Factory Rollout – Dec. 2015
- First Flight – Jan. 2016
- Trifold Two – May 2016
- Trifold Three – Aug. 2016
- SWA Flight Validation – Sept. 2016
- First Delivery – Expected March 2017 (accelerated delivery date)

18. The carrier's own description confirms that the MAX is new and different.

19. The delivery of the MAX8 was originally July 2017, but it has been accelerated to March 2017. Further acceleration may occur, and the public statements of Southwest Airlines in Craig's Update, coupled with the history of acceleration, increase the threat to the *status quo*.

a. The tactic of Defendant Southwest Airlines is to attempt to force SWAPA to negotiate the MAX dispute with an illegal gun to the head of SWAPA in negotiations. The "gun" is the stated position of Defendant Southwest Airlines that while it "expects" a resolution will occur before the MAX arrives and Defendant puts the MAX to use by forcing pilots to fly it, Defendant steadfastly and openly threatens to fly the MAX and refuses to commit to maintain the RLA-required *status quo* until the MAX dispute is peaceably resolved through negotiations. In addition, Defendant Southwest Airlines is using "the clock" to increase leverage, telling SWAPA and its pilots that there is plenty of time before the MAX arrives, while every day there is less time and SWAPA and the pilots it represents daily face an increasing threat that they must either (a) give in to Defendant's bargaining demands, (b) fly the MAX without resolution of the dispute over contract terms as to this unlisted aircraft or (c) engage in what Defendant will call an illegal work stoppage if SWAPA and/or its pilots refuse to fly the unlisted equipment absent contract terms for it. Defendant Southwest Airlines, in short, is presently engaging in a high stakes and illegal game of "chicken." In a "major dispute" situation, where both sides must maintain the status quo, the equivalent violation to that of Defendant Southwest Airlines, where it threatens to proceed with unilateral action even if the MAX dispute is not first resolved, would be for SWAPA to openly threaten to strike if the MAX dispute is not resolved before the MAX aircraft arrive, a threat that Defendant Southwest Airlines would surely seek to enjoin as unlawful until all Section 6 procedures are fully exhausted.

b. Defendants' illegal tactics are a form of asymmetrical warfare in negotiations. If unrestrained Defendant's illegal tactics will cause irreparable harm to SWAPA and the pilots it represents. Defendant's tactics are designed to, and if unrestrained, will force concessions from SWAPA that normal, lawful *status quo* bargaining would not produce, and where the additional concessions forced by Defendant's unlawful tactics cannot be quantified for later monetary remedy.

20. Southwest Airlines has further increased the threat to the *status quo* by recently changing its tune to proclaim there is no need to negotiate terms of work for the MAX, contrary to the parties' past practice and the express terms of the collective bargaining agreement, and that it can put the MAX into service without an agreement with the pilot union.

a. In light of the acceleration of the delivery of the MAX and announcements of Southwest Airlines that there is no need to negotiate terms of work for the MAX, on May 11, 2016, SWAPA's President, Captain Jon Weaks, sought written confirmation from Defendant Southwest Airlines that Defendant Southwest Airlines would "not breach Section 6 *status quo* by flying the MAX without a contract in place as to this new type of aircraft." Captain Weaks advised Defendant Southwest Airlines, "[a]bsent such written confirmation, this Association will have no choice but to file legal action in U.S. Federal District Court and seek status quo protection of our pilot membership due to a "major" dispute under the Railway Labor Act."

b. Defendant Southwest Airlines' response of May 13, 2016 refused to provide the requested written assurance. Defendant explained that its tactic would be to continue to negotiate (expressing its "expectation that we would have negotiated a new agreement by the time the B737-800 MAX enters service in 2017)," while threatening unilateral implementation in violation of the RLA. Defendant Southwest Airlines is thus actively engaged in an illegal

scheme contrary to the RLA, seeking to increase its bargaining leverage by threatening to take illegal unilateral action in violation of the *status quo*. Defendant Southwest Airlines also invited SWAPA to effectively (and incorrectly) concede this to be a "minor" dispute by stating "SWAPA is free to file a grievance if you feel we are not in agreement, and Southwest will, of course, process the grievance."

    c.    Also on May 13, 2016 Defendant Southwest Airlines continued its threat to pilots represented by Plaintiff SWAPA in "Craig's Updated" by incorrectly asserting "the 737 (MAX) aircraft [is] already covered by our existing agreement." Defendant Southwest Airlines' statement in the May 13, 2016 "Craig's Update" attempted to increase its bargaining leverage by threatening to take illegal unilateral action in violation of the *status quo*. Although Defendant Southwest Airlines asserts a contractual right to fly the MAX without resolution over the dispute as to the terms and conditions as to the MAX, Defendant's position is not arguably justified by the terms of the parties' collective bargaining agreement. Defendant's claim that it can use the MAX under the terms of the current collective bargaining agreement without resolving the dispute as to the MAX in negotiations is frivolous and obviously insubstantial.

## GOVERNING LAW

21.    The instant labor dispute is governed by the provisions of the RLA, which defines two types of disputes that may arise between covered employers and the labor organizations representing their employees. 45 U.S.C. § 151 (a)(4) and (a)(5). Disputes falling under Section 151 (a)(4) ("concerning rates of pay, rules, or working conditions") have been coined by the United States Supreme Court as "major" disputes. *Elgin, Joliet and Eastern Railway Company v. Burley,* 325 U.S. 711, 723, 65 S. Ct. 1282, 1289-90 (1945). A "major" dispute concerns contract formation or the amendment of a collective bargaining agreement, and the resolution of

scheme contrary to the RLA, seeking to increase its bargaining leverage by threatening to take illegal unilateral action in violation of the *status quo*. Defendant Southwest Airlines also invited SWAPA to effectively (and incorrectly) concede this to be a "minor" dispute by stating "SWAPA is free to file a grievance if you feel we are not in agreement, and Southwest will, of course, process the grievance."

    c.    Also on May 13, 2016 Defendant Southwest Airlines continued its threat to pilots represented by Plaintiff SWAPA in "Craig's Updated" by incorrectly asserting "the 737 (MAX) aircraft [is] already covered by our existing agreement." Defendant Southwest Airlines' statement in the May 13, 2016 "Craig's Update" attempted to increase its bargaining leverage by threatening to take illegal unilateral action in violation of the *status quo*. Although Defendant Southwest Airlines asserts a contractual right to fly the MAX without resolution over the dispute as to the terms and conditions as to the MAX, Defendant's position is not arguably justified by the terms of the parties' collective bargaining agreement. Defendant's claim that it can use the MAX under the terms of the current collective bargaining agreement without resolving the dispute as to the MAX in negotiations is frivolous and obviously insubstantial.

## GOVERNING LAW

21.    The instant labor dispute is governed by the provisions of the RLA, which defines two types of disputes that may arise between covered employers and the labor organizations representing their employees. 45 U.S.C. § 151 (a)(4) and (a)(5). Disputes falling under Section 151 (a)(4) ("concerning rates of pay, rules, or working conditions") have been coined by the United States Supreme Court as "major" disputes. *Elgin, Joliet and Eastern Railway Company v. Burley,* 325 U.S. 711, 723, 65 S. Ct. 1282, 1289-90 (1945). A "major" dispute concerns contract formation or the amendment of a collective bargaining agreement, and the resolution of

such disputes is governed by § 6 of the RLA, 45 U.S.C. §§ 156, 181; *Western Airlines, Inc. v. International Brotherhood of Teamsters*, 480 U.S. 1301, 1302 (1987). The RLA establishes "major" dispute resolution procedures, including, but not limited to, negotiation between the parties, mediation before the NMB, and voluntary interest arbitration. *Consolidated Rail Corporation v. Railway Labor Executives' Association,* 491 U.S. 299, 109 S. Ct. 2477 (1989). Where employer asserts contractual right to take contested action, ensuing dispute is "minor," under Railway Labor Act, if action is arguably justified by terms of parties' collective bargaining agreement; where, in contrast, employer's claims are frivolous or obviously insubstantial, the dispute is "major." *Id.* at 306.

22. While parties are engaging in the RLA's "major" dispute resolution procedures, they "are obligated to maintain the status quo, and the employer may not implement the contested change in rates of pay, rules, or working conditions." *Id*. at 302-03, 109 S. Ct. at 2480. As such, it is generally recognized that a "major" dispute arises where the parties are negotiating over a new agreement through Section 6 procedures, *see id.,* or where the employer attempts to unilaterally alter the agreement outside of the RLA's collective bargaining procedures. *See International Longshoremen's Association, Local 158 v. Toledo Lakefront Dock Co.,* 1977 WL 1809, at *3 (N.D. Ohio Dec. 16, 1977)(finding a "major" dispute where employer attempted to abrogate the contractual arbitration procedure, because such an action was not a matter of contract interpretation, but an attempt to unilaterally alter the terms of the agreement).

23. Federal District Courts have the power to enforce the duty to maintain the *status quo* and enjoin either party from engaging in conduct that violates that duty. *Detroit & T.S.L.R.R.,* 396 U.S. 142, 90 S. Ct. 294. The RLA's *status quo* requirement is "central to its design. Its immediate effect is to prevent the union from striking and management from doing

anything that would justify a strike." *Id.* at 150. Because one party may wish to change the *status quo* without undue delay, the power granted in the RLA to the other party "to preserve the status quo for a prolonged period" encourages the moving party to compromise and reach agreement without interrupting commerce. *Id.* Injunctive relief may issue, even in the absence of a traditional showing of irreparable harm. *Consolidated Rail Corp.,* 491 U.S. at 303, 109 S. Ct. at 2480.

24. Any unilateral alteration or abrogation of an existing collective bargaining agreement during a "major" dispute is a violation of the *status quo* under the RLA. *See, e.g., International Brotherhood of Teamsters (Airline Division) v. Texas International Airlines, Inc.,* 717 F.2d 157, 160-61 (5th Cir. 1983)(holding that illegality of unilaterally amending or modifying the terms of a collective bargaining agreement during a "major" dispute is an "unquestioned principle").

25. Under Section 2 (First) of the RLA, 45 U.S.C. § 152 (First), defendant is legally required to "exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions . . . ."

26. The Supreme Court has held that this requirement is a legal obligation upon parties covered by the RLA that is judicially enforceable. *Chicago and North Western Railway Co. v. United Transportation Union,* 402 U.S. 570, 91 S. Ct. 1731 (1971).

27. As compared to the duty to bargain in good faith under the National Labor Relations Act, "Section 2 (First) [of the RLA] imposes a higher standard of negotiation efforts ... *Japan Air Lines Co., Ltd. v. Int'l Ass'n of Machinists and Aerospace Workers,* 389 F. Supp. 27, 34 (S.D.N.Y. 1975), *aff'd,* 538 F.2d 46 (2d Cir. 1976).

28. The standard employed in determining what type of conduct constitutes such a

violation is "whether the party charged with violation of its duty has merely gone through the motions of compliance with the [RLA's] required procedures without a desire to reach an agreement." Id. at 34.

29. "Whether this standard has been met must be determined by the whole of the party's conduct at the bargaining table." Id., citing *Kennedy v. Long Island Rail Road Co.,* 319 F.2d 366 (2d Cir. 1963), *cert. denied,* 375 U.S. 830, 84 S. Ct. 75 (1963).

30. A party's unlawful intent not to reach an agreement can be demonstrated where the party was "[e]ngaged in the mere pretense of negotiation, [or] adopted evasive and dilatory tactics that revealed an intent to wait until the union acceded to its demands." *Association of Flight Attendants v. Horizon Air Industries, Inc.,* 976 F.2d 541, 545 (9th Cir. 1992)(internal quotations omitted).

### III. CAUSES OF ACTION

### COUNT I

### FAILURE TO MAINTAIN THE STATUS QUO DURING THE ONGOING "MAJOR" DISPUTE

31. SWAPA re-alleges and incorporates the allegations stated in Paragraphs 1 through 30 as if fully stated herein.

32. In light of the negotiations for wages, rates of pay, relocation expenses, bidding, and hours or conditions of employment particularly applicable to the MAX and the fact that those negotiations have not yet led to an agreement, the parties in this case are currently engaged in an ongoing "major" dispute, and have been since approximately late March 2014.

33. Defendant Southwest Airlines has violated its duty to maintain the *status quo* during a "major" dispute by ceasing to exert every reasonable effort to make an agreement concerning rates of pay, rules, and working conditions for the MAX and failing to exert every

reasonable effort to maintain the agreement as to any type of aircraft other than the B717, B737-300, B737-500, B737-700, and B737-800.

34. Defendant Southwest Airlines has violated its duty to maintain the *status quo* during a "major" dispute by declaring its intent to use the MAX without an agreement with respect to this unlisted type of aircraft.

35. In addition to explicitly violating the RLA, defendant's conduct is in derogation of the policies and principles underlying the RLA, in that the "major" dispute resolution procedures were designed in order to avoid industrial strife and damage to interstate commerce. Defendant's unlawful acts have substantially increased the likelihood that major and/or minor accidents will occur, thereby potentially resulting in serious injury and/or death to employees and customers, and significantly damaging interstate commerce.

36. By the foregoing acts and conduct, SWAPA and its members employed by Defendant Southwest Airlines will suffer irreparable harm if injunctive relief is not provided, because there is no other avenue available to resolve this dispute and avoid industrial strife when Southwest Airlines carries through on its announced intention to fly the MAX without contract terms as to this type of aircraft.

## COUNT II

### FAILURE EXERT EVERY REASONABLE EFFORT TO REACH AGREEMENT AS TO THE MAX

37. SWAPA re-alleges and incorporates the allegations stated in Paragraphs 1 through 36 as if fully stated herein.

38. The parties are currently engaged in negotiations over a new overall collective bargaining agreement and for a first agreement concerning rates of pay, rules and working conditions for the MAX.

39. Pursuant to the RLA, Defendant Southwest Airlines is legally required to "exert every reasonable effort to make" such an agreement.  45 U.S.C. § 152 (First).

40. It is well settled that whether a party violates this legal obligation depends on "whether the party ... has merely gone through the motions of compliance with the [RLA's] ... procedures without a desire to reach an agreement." *Japan Air Lines Co., Ltd. v. Int'l Ass'n of Machinists and Aerospace Workers*, 389 F. Supp. 27, 34 (S.D.N.Y. 1975), *see also, Chicago and North Western Railway Co. v. United Transportation Union,* 402 U.S. 570 (1971)(holding that 45 U.S.C. § 152 (First) imposes a legal duty upon the parties that may be enforced in Federal District Court).

41. Defendant Southwest Airlines has engaged in the following acts and conduct in violation of its duty to exert every reasonable effort to reach an agreement with SWAPA regarding the MAX: (a) showing general hostility towards and contempt for the negotiation process; (b) delaying and frustrating bargaining by refusing to schedule additional negotiating sessions; (c) refusing to promptly respond to proposals made by SWAPA concerning the MAX (d) intentionally and continually making unreasonable bargaining proposals while fully aware that said proposals did not conform to and were outside of existing industry standards; and (e) deliberately engaging in an illegal game of "chicken" with SWAPA and its pilots by threatening unilateral action as to the MAX dispute if negotiations fail to resolve the dispute before the MAX arrives and Defendant manufactures a labor crisis by ordering its pilots to fly this unlisted aircraft before the  parties resolve the MAX dispute at the bargaining table.

42. By the misconduct described herein, Defendant Southwest Airlines has violated its duty under the RLA to make every reasonable effort to reach an agreement with SWAPA regarding the MAX, because such misconduct demonstrates Defendant's desire not to make such

an agreement.

43. Defendant's actions throughout the negotiating process with respect to the MAX evince a clear intent to bully SWAPA into concessions as to the MAX by threatening to put the MAX into service even if the parties fail to first resolve their dispute as to the MAX through negotiations as required by the *status quo* provisions of the RLA.

## JURY DEMAND

44. Plaintiff hereby demands a trial by jury on all claims and defenses in this action.

## PRAYER FOR RELIEF

WHEREFORE, SWAPA requests that Defendant Southwest Airlines be summoned to appear and answer, and that on final trial, judgment be granted against Southwest Airlines, awarding SWAPA the following:

**As to Count I:**

(A) Issue injunctive relief enjoining Southwest Airlines from unilaterally abrogating and altering the relevant collective bargaining agreement(s) with respect to the MAX pending completion of the RLA's "major" dispute resolution procedures, and ordering Defendant Southwest Airlines to immediately revert the *status quo* under the existing collective bargaining agreement(s) as to the MAX;

(B) Issue injunctive relief enjoining Defendant Southwest Airlines from using and/or threatening to use the MAX pending completion of the RLA's "major" dispute resolution procedures as to this type of aircraft, and ordering Defendant to immediately revert the terms and conditions of the *status quo* under the existing collective bargaining agreements as to the MAX;

(C) Issue a declaratory judgment that Defendant Southwest Airlines has violated its duty to maintain the *status quo* during a "major" dispute by ceasing to exert every reasonable effort to make an agreement concerning rates of pay, rules, and working conditions for the MAX and failing to exert every reasonable effort to maintain the agreement as to any type of aircraft other than the B717, B737-300, B737-500, B737-700, and B737-800;

(D) Issue a declaratory judgment that Defendant Southwest Airlines has violated its duty to maintain the *status quo* during a "major" dispute by declaring it can and will put the MAX into service without an agreement with respect to this unlisted type of aircraft;

(E) Issue a declaratory judgment that Defendant Southwest Airlines is legally required to make every reasonable effort to reach an agreement with SWAPA regarding the MAX and that Southwest Airlines has failed to meet this legal requirement.

**As to Count II:**

(A) Issue an order requiring Defendant Southwest Airlines to cease and desist engaging in the unlawful conduct of failing to exert every reasonable effort" to reach an agreement as to the MAX; and

(B) Issue injunctive relief restraining and enjoining Defendant Southwest Airlines from refusing to "exert every reasonable effort" to reach an agreement as to the MAX going forward;

(C) Issue a declaratory judgment that Defendant's actions during negotiations with respect to use of the MAX constitute a failure to "exert every reasonable effort" to

reach an agreement in violation of Section (First), 45 U.S.C. § 152 (First).

**As to Counts 1 and II:**

(A) Award SWAPA its reasonable costs and attorney's fees associated with this proceeding; and

(B) Grant such other and further relief as the Court deems equitable and just.

DATED: May 16, 2016

Respectfully submitted,

By: /s/ Hal K. Gillespie
Hal K. Gillespie
hkg@gillespiesanford.com
Texas State Bar No. 07925500
James D. Sanford
jim@gillespiesanford.com
Texas State Bar No. 24051289
Gillespie Sanford LLP
4925 Greenville Ave., Suite 200
Dallas, Texas 75206
Phone: (214) 800-5111
Fax: (214) 838-0001
and

K. Helen Yu
hyu@swapa.org
Texas State Bar No. 24071565
Jonathan Elifson
jelifson@swapa.org
Texas State Bar No. 24096065
Stella Dulanya
sdulanya@swapa.org
Texas State Bar No. 24072077
Southwest Airlines Pilots' Association
1450 Empire Central Drive,
Suite 737
Dallas, TX 75247
Phone: (214) 350-9237
Fax (214) 351-2504

ATTORNEYS FOR PLAINTIFF
SOUTHWEST AIRLINES PILOTS'
ASSOCIATION ("SWAPA")